Corwin, J.
The first objection to the verdict and judgment in this case, which I shall notice, is, that the court erred in not granting a new trial, on account of the situation and conduct of the jury while they were consulting of their verdict. It was agreed, on the motion for new trial, that the affidavits of witnesses would prove that, after the jury received the charge of the court, some of the jurors held communication with their friends and acquaintances in the street, the' persons so violating their duty being at the open windows of their consulting-room. Yarious questions were put to-the jury—as to whether they had agreed upon their verdict, whether they were likely to agree, how they were divided—some of which questions were answered from the jury-room. The prosecuting attorney was desired by one of-the jurors to cause a change of clothing to be sent to one of the jurors. It appears, however, that he made no reply. Other communications and conversations', passed and occurred between the jurors at the windows and persons on the sidewalk below, but no conversations on the merits of *49 the case are known to have taken place These facts do not rest on the testimony of witnesses who were of the jury. Other facts, resting on *proof taken from members of the jury themselves, are shown by the bill of exceptions. I have no doubt the general rule of policy, and a just regard to the sanctity of the province in which the jury is appointed to act, are against the reception of such evidence, in an ordinary case; but in one where life, or even liberty, is threatened by misconduct of the jury, it will readily be conceived that circumstances may exist which would not only admit, but demand, the examination of members of the jury as to their alleged bad behavior. In every such exceptional case, a foundation must undoubtedly be laid for the introduction of affidavits by jurors; and it would seem that this foundation ought, in general, to consist of knowledge acquired by the court by other means than the affidavits of jurors themselves. When once the court have reason to believe that the misbehavior of jurors may have given a wrong direction to their verdict, it may bo well, in a proper case, to explain or enlarge the evidence of actual misconduct by testimony taken from the jury itself. To this extent, at least,. I think it safe and just to regard the affidavits of jurors as admissible ; and, while courts can not too sacredly regard the purity and freedom of a jury’s action, I deem it a duty as well as a right to protect the alleged criminal from a misconduct almost as reprehensible as that with which he may be accused, by accepting the-best evidence which can be offered of the wrong done, not so much to the individual accused as to the administration of justice itself, when a jury trifles with its duty, or forgets its high and solemn, obligations.
In the instance before us, the foundation to which we have referred was properly laid, and the court, having thus, prima facie, a case of misbehavior in the jury, might well have considered the further facts, which are said to be provable by the affidavits of particular jurors.
It was admitted, in addition to the facts already stated, that witnesses would prove, “that a member or members of the jury, on the second or third day of their deliberation, obtained a newspaper containing what purported to be a part of the ^proceedings had at the trial of said cause, viz., the charge of the court.” It is further admitted, that the testimony would prove, that on the last day of their deliberations, a member of the jury was heard read *50 ;ing aloud in the jury-room, from the charge of the court. And, though it appears that the newspaper spoken of, was taken from the jurors, by the deputy sheriff, in attendance on them, as soon :as he discovered it in their possession, the testimony thus far sufficiently shows misconduct of the jury, to warrant, in my opinion, the consideration of the facts proven by jurors themselves, relating to this point of objection. And those facts certainly disclose matter for grave and serious reprehension. The mere reading of newspapers disconnected with the trial, like the reception by two members of the. jury of spirituous liquors, (which, in one instance, may have been prescribed by a physician, and in the other, may have been necessary to health, though not prescribed,) would be little subject to animadversion, on a motion for new trial. But there is much more important matter in this testimony of the jurors. It seems, “ on the last day, or the last day but one of said deliberations, a member or members of said jury procured a part of a newspaper, containing what purported to be a portion of the charge of the court in said case; and said portion of said charge was kept, read, and used by said jury, in their deliberations for several hours next preceding the time of their agreement upon a verdict.” It is said by the bill of exceptions, that the whole of the court’s charge was not published, “ but all the material parte of said charge in condensation, and the whole charge on imbecility •or insanity was published correctly, as was known to the court, at •the time the court overruled said motion.”
The charge was not a written one, delivered from manuscript ■and handed to the jury by the court itself. I am not prepared to say, that a court has not better performed its duty in such a case as that hinted, than when the charge is unwritten, and rests in the uncertainty of the jury’s recollection. But the real case' before us is widely different. The court, indeed, on the motion for a new trial, recognizes the ^correctness of the publication, as to the ■charge on insanity or imbecility. But this recognition can not cure ;a mistake so pernicious, or justify us in upholding a px-ecedent so ■dangerous as would be furnished by-the conduct of this jury, in procuring without authox’ity, and without either presence or (knowledge on the part of the accused, a paper such as that-de•Bcribed, or a report, however accurate it might chance to be, of the •charge of the court. The court would have ex-red, had it even repeated its charge in the absence of the prisoner or her counsel. A *51 verdict can not be sustained where a jury has so far mistaken its ■duty, or abused its authority, as to procure of its own motion, and by its own means, a real or pretended report of the instructions it has received, and to make that report the guide of its deliberations and the basis of its conclusions. On this testimony .alone, it would appear that the judgment in the case before us ought to be reversed.
If, however, the case shown by the record does not strike all minds as sufficiently objectionable to justify the admission of the .affidavits of jurors, and if the other testimony does not establish beyond all doubt that there was any real abuse in the particular, last considered, what shall be said of the freedom allowed to the jury, and the abuse of that freedom, in holding such conversations as we have described, with persons in the street ? On this subject, we have been referred to the new code as, not the law of the case, but a fair embodiment of rules which were, or ought to have been, observed before the code was adopted. And in this point of view, we are disposed to regard it. By sections 268 and 269 of the code, the following provisions are made:
“When'the case is finally submitted to the jury, they may decide in court, or retire for deliberation. If they retire, they must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict, or are discharged by the •court, subject to the discretion of the court to permit them to separate temporarily at night and at their meals. The officer having them under liis-charge shall not suffer any communication to be .made to them, or make any *himself, except to ask them if they have agreed upon their verdict, unless by order of the court, and he shall not, before their verdict is rendered, communicate to .any person the state of their deliberations or the verdict agreed •upon. If the jury are permitted to separate either during the trial, or after the case is submitted to them, they shall bo admonished by the court that it is their duty not to converse with, •or suffer themselves to be addressed by any other person, on any subject of the trial, and that it is their duty not to form or express an opinion thereon, until the ease is finally submitted.”
Such are the wise and liberal provisions of the new code as to civil cases.
They are such as ought always to have been enforced. They depart from an ancient and useless severity, but they preserve the *52 sense and substance of all that ought to be held sacred in the action of a jury. The record before us shows a conduct very opposite to that required by such regulations; and, in a case of the least doubt, no verdict of a jury has or can have its usual and proper force and obligation with the court, if it appear that the jury has exposed its privileges to abuse, or listened from its sanctuary tounsworn and irresponsible counsels.
And these reflections may be the more readily and safely indulged when we consider thealleged insufficiency of the evidence to maintain the verdict in this case. I can not but regard the conclusion arrived at by the jury as sufficiently doubtful in itself to enforce the necessity of considering such misbehavior on the part of the jury as may possibly have led to such a result. Such an illustration will be proper in itself, and it will enable us the more speedily to reach the correct determination of the question before us. Where a court doubts the sufficiency of the evidence to uphold a verdict, it usually silences the doubt, by recognizing the right of the jury freely, independently,and purely,to answer, out of its own unhindered and uncontrolled deliberations, every question 'of fact. But when it is apparent that there has been either abuse by the jury of its rights and functions, or improper *interferencefrom without, it can not be said that those questions have been answered as the law requires. And, in a case like the present, I should not hesitate to give full sway to the doubt which must arise in every intelligent mind, on reading the evidence of the prisoner’s capacity to commit the crime imputed to her. The history of crime hardly presents a more remarkable case than that we are here called upon to consider.
Nancy Farrer is shown to be a young woman, whose usual occupation has been that of a nurse. She is described by the witnesses as remarkably kind to children. Indicted for poisoning a little boy, eight years old, the father of the boy freely testifies that he “ found her character and conduct very good.” “ No mother,” he says, “could have shown more kindness than-she did.” The “ neighbors all talked about her being so kind ” to the children, and to Mrs. Forrest, the mother of the boy named in the indictment. There is full testimony to the effect that in several households Nancy, though awkward and in many respects incapable, proved herself a kind and affectionate nurse. She seems to have preferred the society of children. It is further testified of her, that she *53 hardly ever spoke except when spoken to—asked no questions—■ never ran after company—readily did What she was bid.
In person, she is remarkably ugly. The eyes encroach on the space proper to the brain. Her head, in shape rather than in size, is unfavorable to the usual presumption of sound mind and full capacity. We have no opinion to express on the claims of rival ■schools in medical jurisprudence. Whether phrenology is a science or a delusion, wo shall not judicially undertake to pronounce. Whether medical science should be unalterably wedded to one established orthodox system, or progressive and eclectic in its char.acter, we are not called upon to say. But intelligent physicians •of opposite faiths agree in such an estimate of the prisoner’s original capacity, as, in my judgment, renders it improbable that she could have been sane at any time or in any circumstances. ^Whatever the quarrels of doctors, how little soever-the weight which their opinions in such cases usually deserve, other testimony shows that, thus marked out from the common characteristics of our fellow-beings by her personal appearance, and thus apparently deficient in capacity, the facts of Nancy’s history agree with the conclusions so given by medical men. Nancy was not such a women as others. And her training such as rather to destroy than improve the little mind with which nature may have gifted her. Her father, an Englishman (who became a Mormon, and with Nancy and her mother lived for some time at Nauvoo), died of drunkenness in the hospital at Cincinnati. Her mother was a Mormon, and fancied herself a prophetess—Nancy imagined herself “ the same as her mother.” Nothing, indeed, like ordinary insanity appears from the evidence, except Mr. Forrest’s account -of Nancy, after his son’s death, in a scene to be noticed presently, and a few expressions here and there, which have not the ring, so to speak, of a sound mind, though in themselves they amount to little. But, on the whole testimony, I am disposed to hold that the jury were not warranted in a verdict supposing the sanity of the prisoner, and which ought not to have been rendered while a reasonable doubt of that sanity remained. Taking into consideration the possibility, not to say the proof, that the misconduct of the jury produced a verdict little entitled to regard, I feel free to look into the facts on which the state relied for a conviction, to see if these facts are such as to set aside the supposition of imbecility I have ventured to make, taking the testimony altogether.
*54 Such as she was, unfit in many particulars for the charge of children, but with a kindly disposition, and a generally good character, Nancy entered the family of Elisha Forrest, about the 27th October, 1851, and was there a house-servant, with particular charge of the children. While so employed, it is not disputed that, she poisoned every member of the family, and that the mother and two children died of that poisoning. Mr. Forrest testified that he had known Nancy three *or four years by sight, but never spokoto her till she came to his house. She was recommended to him by Mary Ann Dankey, a girl he had in his household in the same capacity for which Nancy was engaged.
The bill of exceptions shows a mass of testimony too great to be made part of this opinion, but the leading facts material to the subject now considered, may bo stated as follows :
The mother, Mrs. Forrest, who was taken sick while eating, died on Monday, one week after Nancy came.
Mary Ann Dankey, the girl whom Nancy succeeded in the service of Mrs. Forrest, relates that, going to visit Mrs. F. the day after Nancy came, the latter asked if Mrs. F. was not a croás woman. The witness answering in the negative, Nancy replied that she (Mrs. F.) had insulted her (Nancy) more than she’d ever been insulted before. The witness adds : “ She said she had spilled some water between the table and the stand, and Mrs. Forrest had made her scrub the floor over, because she had not scrubbed it clean, and stood in the door and watched her.” She said further, “ she-had a notion of speaking back about it, but thought she’d fix her for it.” Mrs. F. had been sickly for some time. She first experienced the effects of the poisoning (as is now apparent) while-eating a supper, at which Nancy was present. Nancy asked a witness what she thought of Mrs. Forrest; the witness answering, that she hardly knew what to think-—she was very sick. Nancy replied, that Mrs. F. “ had been taken with vomiting and heaving, just like Mrs. Green.”
This reference to Mrs. Green will be better understood, when we come to consider another objection, made by counsel, to the conviction in this case. For the present, I shall not remark upon it.
Another witness testified that she sat up at Mr. Forrest’s the night after his wife died. Nancy sat up part of the.night—would not go to bed, though desired to do so. 'Witness went to the kitchen and took a tea-kettle off the stove—it had some water in *55 it. “ By that time, Nancy came down. She jerked the tea-kettle - off the stove. She said, 1 You devil, you ! I ’ve *a notion to kill you.’ She put the kettle behind the stove, put the coffee-boiler on the stove, took cold water out of the bucket, and put it into the boiler, instead of the hot water, which was in the kettle. I told her she would not kill me. She made no reply ; I thought she was just a joking.”
Still another female witness had a conversation with Nancy when Mrs. E. was sick. "Witness said, that it was singular Mrs. F-should have been taken worse after having been so much better in the afternoon. Nancy answered, “ it was just the same way with Mrs. Green. She said, Mrs. E. took to heaving just like Mrs. Green, and she did n’t think she would live.”
¥e may pause here to remark, that the pettish expressions of the prisoner, in reference to Mrs. Forrest, are all the indications of anything like malevolence toward that lady or any other member of the Forrest family. I can not think those expressions prove positive ill-will. Nancy may have selected Mrs. Forrest as her first victim in that household, out of the disposition of mind, accident-, ally given by a little scolding; but I can discover in this or any other evidence in the case nothing like malice. And, indeed, I find in the whole case, no motive such as could animate a sound mind, however depraved in morals.
If. we pursue the testimony, we shall find other evidences of consciousness, concealment, and even of cunning, but none, I think, of malice.
John Edward Forrest died next, a little over three weeks after Nancy came. His sickness was like that of his mother. A witness states that she said to Nancy, when James Forrest was sick (she was indicted for the murder of James), “it (meaning the matter vomited) is green; they are all dying of the same disease, just as Johnny died.” The witness made a similar remark when Johnny died. Nancy did not reply either time. It appears, however, from the same testimony, that when the witness was informed by the prisoner of James’ sickness, Nancy told her, that “ Jimmy was taken with a vomiting' and heaving, just as little Johnny was.”
*To another witness, who remarked after Johnny’s death that Nancy was very unfortunate to live where so many people died, the prisoner replied: “ Yes; five have died where I lived—first of *56 all were Mrs. Green and her baby, and Mrs. Isherwood’s baby died a day or two after I left.” And, being asked what was their complaint, she said Mrs. Forrest was consumptive, and she expected the children were like her. She said, “ Jimmy will go next, and 33' lly, and the old man, and I expect they ’ll all go of one complaint.”
The bill of exceptions shows, that after Johnny’s death, Nancy told a witness, joking, “how lucky she was with sick folks; they all died in her hands.” -The witness saying, 11 May be you killed them,” she said, “Maybe I did.” She “appeared to be joking— seemed to be smiling—seemed to bo very careless about it.”
Another witness testified, that while Mrs. Forrest was sick, remarking on the singularity of that lady’s sickness, Nancy said, “it was just the same wajr with Mrs. Green. She said she took to heaving just like Mrs. Green, and she did n’t think she would live.”
It was further testified, that after Johnny’s death, a witness said to Nancy that she had very good luck in losing people on whom she waited, she answered, “ Yes—she had.” Witness asking how many she had lost, she said six; “but,” says the witness, “ I found it was five. I asked who they were. She said, Mrs. Green and her child, Mrs. Forrest and her child, and another woman and her child, whose name she had forgotten.” The witness inquiring what was the matter with Mrs. Forrest and Johnny, Nancy answered, “ that the doctor had said, but she had forgotten. She said, in a week or two Johnny will die.” Witness asked what was the matter with Mmf “She said she didn’t know, only he wouldn’t eat.” At this time, Johnny was running round the Streets, playing with other children.
On the day when Jimmy was taken violently ill, Nancy told a witness to come and see him—he was very sick; that *he was taken just like Johnny, and she didn’t think ho would live. Says this witness : “ I asked her what she was making ; and she said, a pair of drawers; for she thought ho would need them—she would have them ready against he would die.”
Nancy was at the house of another witness, after the death of Mrs. Forrest, and before the serious illness of Jimmy ; and while she was there, the witness advised her to give the child onion syrup for a cold, and supplied her with onions to make it. And it appears that the child, during his sickness, repeatedly said in Nancy’s presence, “ it was that onion syrup that make him sick.” Nancy *57 ‘herself joined with the child in this account of what made him .■sick; but, in the words of the witness, “ Jimmy replied more so. than Nancy.”
The child, James Wesley, became very ill two days before his ■death. Between 10 and 11 o’clock of the forenoon, while the father was at work on the top of a rolling-mill, Nancy beckoned to him, telling him when he came down to meet her that Jimmy was very .sick, that he was taken with a vomiting.
On the night of the same day, Nancy did not eat supper with the family, though such was her custom. It appears that Mr. Forrest, the father, and Billy Forrest, a brother of James Wesley, were ■seized with vomiting, etc., after this supper.
On Tuesday, the father ’said in Nancy’s presence, that if the ■child died, and the doctor didnot find out what was the matter with him, he (the father) would have him examined, and would break ■up housekeeping also. “ She did not say anything.”
Another witness testifies, that a short time before James died, she was at Mrs. Forrest’s and Nancy asked her, “ who they were .going to send for to hold a council over James.” Witness told her that they had sent for Foster or Dandridge. “ She said it was of no use to send for them, they did not know what ailed Mrs. Green, and would not know what ailed James. If they sent for Dr. Judkins, he could tell right away. He knew right away what ailed Mrs. Green.”
*A post-mortem examination was held, and the child’s ■stomach examined. Nancy, being present, heard the whole of a ■conversation, in the course of which Dr. Dandridge said the boy had taken arsenic. Nancy said nothing. The doctor asked the father if he had anything about the house to kill rats; and being answered in the negative, observed that the father ought to be very careful how he “ suspieioned such things the father replied, that he had never suspieioned anybody at all. The witness who testifies to these things, further says, that, after the suspicion of the child’s being poisoned came out, Nancy seemed to be somewhat excited, and anxious if any two wore talking, to get close to them, and to wish to know what they were saying. In the words of the witness, “ she would go around and get close to them, and listen. She would walk close up to them.”
There is other testimony as to Nancy’s demeanor at this time, but it is not necessary to state it.
*58 At a late hour, when the witness came into the room where the corpse was, Nancy was sitting by the fire in a little chair ; as the witness described it, she “ appeared to be studying about some thing.” She had a string in her hand ; she was wrapping it on her fingers and taking it off; would put into her mouth and break it, and put it on her finger again. The witness “ never observed hordo this before.”
Nancy had been “ up town a square,” between the time of the post-mortem examination and her arrest. No one was sent with her; she was not watched. After th e post-mortem examination, or during it, she “ appeared to bo scared.” The witness adds, however, that she “ acted pretty much as others did; did not appear to be badly scared. She showed no desire to escape.”
The father had a conversation with Nancy, in which he said: “ Nancy, this is a pretty hard case; to think these children are all poisoned.” He said further, “ You ’ll have to bear the blame of it.”
She said she did not do it. He replied, “ You heard the doctors say the child had taken arsenic.” She said she “ did not know what arsenic was.”
*On Thursday night, after Tames was buried (he died on Wednesday), Mr. Forrest found on the steps leading to Nancy’s room, a paper with the label of Dr. Salter’s drug-store upon it, “ which paper,” says the witness, “ must have dropped there from clothes taken out of the room a short time before.”
A witness states that she met Nancy one morning, near Salter’s drug-store, and that she afterward asked 'Nancy whether, when she thus saw her, she was going for medicine; Nancy said no, she was going for muslin.
Mr. William Salter (of Dr. Salter’s drug-store) testified that about throe weeks before the stomach of James Foster was brought to his brother to analyze, he sold Nancy five cents’ worth of arsenic, done up in a paper like that produced by Mr. Foirest; the witness-thought the same paper. Nancy said she wanted it to kill rats.
Other druggists testified to the purchase by Nancy, at different times and places, of large quantities of arsenic; one thinks he sold Nancy arsenic as long as six months before the death of James. One of the druggists says she got from him enough to poison twenty people.
Dr. Salter analyzed the stomachs of James Forrest, Mrs. Forrest, John Forrest, and Mrs. Green; the bodies of the three last named *59 being exhumed for the purpose. He found them all to contain arsenic.
Putting-aside,, for the present, the objection to the testimony relating to the death of Mrs. Green, it is proper to remark that there can be no reasonable doubt of Nancy’s being at least a participant in the poisoning of that lady. But here we have less evidence of motive than in the case of Mrs. Eorrest. It would, perhaps, be wrong to pass on the question of Mrs. Bazley’s guilt or innocence; but if the facts attending Mrs. Green’s death are to-be at all considered, they appear to me to show Nancy as an instrument of some stronger will, a tool of the destroyer, rather than one willing the mischief she performs. No hatred, no quarrel, no cause of malevolence toward Mrs. Green, is apparent on the part *of Nancy. And I can not think any love of plunder, or hope of gain, is established against her by the evidence.
What, then, are we to think of this whole case ? The pretense of the prisoner, that on the morning referred to by one of the witnesses, she was going to purchase muslin, when, as we must now believe, she was on her fatal errand for the poison ; her affectation of ignorance as to the nature of arsenic, when Mr. F. spoke to her on the subject, after the child’s death, though she had bought that article so often; her warning some of the witnesses against the use of the onion syrup, with which she poisoned James; her hindering a witness from using the tea-kettle, containing, as we must believe, jjoisoned water; all these things are not insignificant of consciousness on the part of Nancy that she was doing the work of death. The other facts to which we have alluded, show that she had something like cunning, while engaged in her fearful, purpose. She invents stories and excuses. She gives various accounts of the sickness by which so.many victims are falling.
On the other hand, she is careless, open, and, for her, communicative. She does not destroy the label showing where the arsenic-was procured. She shrinks from no conversation respecting herconcernment in all these deaths. She frets about the poisoned child. She evidently loved each of the children she destroyed. Her demeanor is at least singular for a guilty person, in many trying scenes disclosed by the evidence. I can not imagine her as other than idiotic or imbecile, when I recall that scene where Mr. Forrest observed her “studying about something,” and wrapping and unwrapping the string about her finger. Here was no trouble,. *60 no disturbance; neither fear, nor anger, nor shame, nor grief, nor hardihood; nothing to show that she was a rational human being, conscious of having taken human life—and that the life of one she appears to have loved, and certainly did not hate. This alone would indeed weight but little; but there is'much more in the eviidence. I shall not here recite Nancy’s history from childhood. It is enough to say, I think it ^proves her weak-minded and imbecile. And, while I believe that the verdict of the jury may have been-influenced by the communications with those outside of their number, by the gestures, the looks, or the cries of those with whom they were allowed to converse, I can not (as I would in any other case) respect the finding of the jury, as putting an end to the question of sanity or insanity.
For the double reason, therefore, that the jury so misbehaved as to impair, if not wholly to destroy, the estimation commonly due to such a finding, and that the weight of the evidence appears to leave a serious doubt of the sanity of the prisoner, I think a new trial ought to be granted.
The court below, indeed, charged the jury, that when the plea of insanity is set up, the defense must be established by a prepon - •derance of testimony—that the insanity must be affirmatively proved. But taking the whole charge together, I do not think the sense of these words is so extensive as counsel appear to con.strue it. The court characterized the old rule, requiring insanity to be proved beyond all reasonable doubt, as a doctrine which, though useful in its time, is too hard to uphold. And I can not ■see that a reasonable doubt of a prisoner’s sanity can legally arise, except upon a preponderance of testimony. A mere preponderance of testimony as to the guilt of a person, will not satisfy the law; there must be such a preponderance as removes all reasonable doubt. But, as we understand the court below, a mere preponderance of testimony in favor of insanity may raise a reasonable doubt of guilt, though such preponderance may not prove insanity beyond reasonable doubt. I think this the true sense of what was charged in this case; and I do not discover any reason for setting aside the verdict, -so far as this particular instruction is concerned.
Further exception is taken to the charge of the court, on the ground that it gave too narrow a definition, and established an imperfect test, of insanity. “Insanity,” said the judge, “ exists in *61 so many shapes and forms, it is almost impossible for science to-comprehend it.” .... “ Insanity, in its ^general legal sense, is the inability to distinguish between right and wrong; and as applied to this case particularly, this is the question for you to settle: ‘Was Nancy Farrer, at the time this act was committed, capableofjudgingwhethorthisactwas wright or wrong, anddid she know at the time that it was an offense against the laws of God and man?’” . . . “ She-or he who administers poison to kill, and knows at the time that it is wrong to do so, is guilty of murder in the first degree.” . . . “So far as the girl Nancy is concerned, you will carefully examine the testimony touching her knowledge of right and wrong, and if you find she was able to distinguish between them, then, no matter of how low an order may bo her intellect, or how depraved her character, she is guilty as charged, if you have no reasonable doubt as to her commission of the act.” The case of Commonwealth v. Rogers, 7 Met. 500; Clark v. State, 12 Ohio, 495; State v. Summons, West. Law Journal (June 1852), are referred to, as containing the true definition of insanity, and showing the imperfection of that before us. The power of self-control—“ free agency ”•—is said to be quite as essential to-criminal accountability as the power to distinguish between right and wrong. And I have no doubt that every correct definition of sanity, either exjiressly or by necessary construction, must suppose-freedom of will, to avoid a wrong, no less than the power to distinguish between the wrong and the right. And in this very case, I can. see many reasons why it would have been proper to say thus much-to the jury in so many or in similar words. But no special instruction was asked, so that the court did not expressly deny the necessity of such a qualification of its rule. The question here to-be considered, is, therefore, does the definition of the court shut out the notion that accountability may be destroyed by the absence of what counsel call the power of self-control or free agency ? I think not. The definition given below is such as we frequently find in the books, and, giving it such a construction as it would probably receive from a sensible jury, I think it not so inaccurate as to prejudice the prisoner’s rights. True, *there arises upon the facts in this record a not h^-ational theory, that some strange,, irresistible wish to see the effects of poison—to produce death-may have had such power over the prisoner, as other insane fancies-which so often make a man or woman little more than a piece of *62 •mechanism.—neither more capable of self-control, nor of asserting the tiue laws of its being against the foreign influence. But the language of the court does not forbid the jury to consider such a •-state of fact, if it were proven ; and the jury would do so unless prohibited. I should not, after mature reflection, bo inclined to -disturb the verdict, if the objection here considered stood alone.
The only remaining assignment of error necessary to he noticed is one, with regard to which, considerable diversity of opinion has been entertained by members of the court. It is that which demands the reversal of this judgment on the ground of the admis.sion of testimony to prove the poisoning of Mrs. Green by the plaintiff in error.
Of the deaths which occurred in the Forrest family, evidence was received without objection. And those deaths were so connected, that I must regard the evidence so far as proper and material. But I am utterly unable to perceive any reason for the proof allowed of a poisoning which took place months before that for which the indictment was framed. It does not appear, that the same band which poisoned Mrs. Green must have poisoned Mrs. Forrest. There is no necessity to show that Nancy poisoned Mrs. •Green, in order to prove that she had poison wherewith she might have poisoned the Forrest family. That she had such poison, elsewhere sufficiently appears. The very first witness on the stand states such facts as would leave no reasonable question of her having dropped a label, afterward so identified as to show that Nancy purchased poison while in the Forrest family. And there is direct evidence of such a purchase after the time of Mrs. Green’s death. Nor can it be successfully argued that this proof of the poisoning in August, was necessary to show that in November the prisoner knew the nature *and uses of arsenic. The intent of •the prisoner was not to be so established. In the ease of passing ■counterfeit money, evidence of other acts of passing is admitted, because many persons occasionally take counterfeit money, and attempt to pass it, while ignorant of its spurious character. But persons do not buy arsenic without knowing its uses. They majr not know its name—they may call it ratsbane, or what you will; bub they do not buy it without some purpose of destruction. If, indeed, it were shown that the prisoner, a weak-minded, ignorant person, had found a paper of arsenic, and pretending to think it «harmless, had administered it to members of the Forrest family, *63 her pretense of ignorance might be set aside by proof, from any source, that she had before administered what she knew to be the same article, and had thus learned its baneful character. But such were not the facts in this case. There was direct evidence that Nancy purchased arsenic, knowing its destructive character—her avowed object being to use it for the destruction of rats. And there is no evidence even tending to show that the prisoner made any pretense of having used arsenic while ignorant of its real character.
Another objection to this evidence, even in the case supposed for its admission, would be, that it would present such a building of inference upon inference as all the rules of logic and of law seem to forbid.
I am clear in the opinion that this testimony ought to have been excluded. It could not perform any other office than that of needlessly exciting prejudice against the accused.
I have not thought it proper to notice the objection, that the opinion of witnesses on the subject of the prisoner’s mental capacity were drawn out by the state at too early a period in‘the testimony. Though there may have been irregularity in this particular, it does not appear, from a careful examination of the testimony which preceded and induced it, to have been wholly irrelevant or impertinent in the time and in the manner of its introduction.
^Thurman, J.
I am satisfied that a new trial ought to have been granted, because of the misconduct of the jury. I do not mean to say that the jurors did wrong intentionally, nor is it necessary to say so. Misconduct is not always willful. It may bo innocent so far as motive is concerned. But whether willful or innocent, it may prevent a fair trial, and therefore be fatal to a verdict.
I am also of opinion that the testimony to prove that the accused poisoned Mrs. Green was improperly admitted. I attach no .importance to the argument that the statements of the accused made it proper evidence. I see no statement of hers in the record that could have that effect. The only plausible ground for its admission is, that it was competent for the state to prove that the prisoner knew the deadly nature of arsenic, and that it was no valid objection to testimony proving this fact, that it showed she had .committed another homicide. That this argument is entitled to *64 much weight, I admit. For, while the general rule is that proof' of the commission of other crimes is not admissible to show the defendant guilty of that for which he is on trial, yet there are cases-in which testimony is not exceptionable, although it does disclose the commission of other crimes. Thus, on a trial for passing counterfeit money to A, it is perfectly competent, in order to prove the scienter, to show that the accused has passed similar counterfeit money to other persons. Other illustrations might be given, but I confine myself to those that relate to scienter, as being the cases most nearly in point. Now, why is it that upon a trial for passing counterfeit money, proof of divers other titterings is admissible? The reasons are : 1. Because the state must prove, by her evidence-in chief, that the accused knew the money to be counterfeit. 2* Because, in general, the best evidence of this scienter that can be produced, is proof that the accused had more spurious money in his-possession than would be likely to come to’the hands of an honest, man in the ordinary course of business.
*The state is bound to -prove the scienter, because money is-so skillfully counterfeited that there is no one who is not liable to-be deceived by it. No presumption whatever of guilty knowledge arises from the bare fact of passing a counterfeit coin or note", unless, which is but seldom the case, its baseness is apparent, and the person receiving it is a fit subject for imposition.
But how is it with respect to the nature of arsenic? Is it not undeniable that the fact is almost, or quite, as well known, to people-generally, that arsenic is a deadly poison, as that a dagger, or a gun, is a deadly weapon ? I think it is. I suppose there are few men or women, and but few children either, except those of tender years, who have not heard of arsenie, and that it is a poison that produces death. But, on a trial for homicide with a knife or gun,, no one would think of permitting the prosecution, under the pretext of showing that the accused knew the weapon would kill, to-give testimony of other homicides committed with it by him, unless some evidence had been introduced tending to prove that it was not a deadly weapon, or that the defendant supposed it was not. And yet there would be nearly, or quite, as much reason for doing so, as there was for admitting the proof in relation to the poisoning of Mrs. Green. For when that proof was admitted there had not been a particle of testimony to show that Nancy Farrer was imbecile, or less capable than other persons, or that she *65 was ignorant of the nature of arsenic. Indeed, as appeared in the further progress of the trial, the prosecuting attorney had it in his power, at any time, by calling the druggist who sold her the arsenic, to prove that she fully knew the deadly quality of the drug. With what object, then, was the proof of the poisoning of Mrs. G-roon offered? To prove that Nancy Earner knew that arsenic would kill? No such thing. The real object was, by the introduction of proof that she had poisoned Mrs. G-reen, to render it more probable that she it was who poisoned James Wesley Forrest. And this, I have no doubt, was the whole effect of the testimony upon the minds of the *jury. And here is one of the greatest dangers of admitting such testimony. Admitted ostensibly to prove a fact that requires no proof, its effect is to satisfy the jury of the existence of other facts, to prove which it is confessedly incompetent. Now, I think the only safe rule is to say, that where the state has proved the administration by the accused of arsenic, or any other poison equally well known, and that he knew it was arsenic, or such other poison that he administered, and death has resulted, a presumption arises, in the absence of any other proof, that he knew the deadly character of the drug, and intended to kill; and that it is not competent, at that stage of the case, for the prosecution to assume that the accused did not know the quality of the poison, and, under pretext of furnishing proof of his knowledge, give testimony tending to show him guilty of other poisonings at a wholly different time. The effect of such testimony is obvious. It comes upon the accused without any notice whatever; it finds him without any preparation to meet it,, and unable, perhaps, from that very want of preparation to rebut it, however innocent he máy b.e; it convinces the jury that he was the poisoner in the particular case under consideration, though it was admitted for no such purpose; and this conviction, charge what the court may as to the proper effect of the testimony, hangs with a deadly weight upon the prisoner’s defense. What would be said in a case of homicide with a knife, if the prosecutor, to prove malice, should offer testimony that the prisoner, months before the homicide, had wantonly slain divers persons? No court would think of admitting it. And yet it would strongly tend to show that he was a man “regardless of social duty, and fatally bent upon mischief,” a fact most material in considering the question of malice. Or, what would be thought of the admission, on a trial *66 for robbery, of proof that the accused was a robber by profession, when the door to such proof had not been opened by the accused? ■Such a ruling would quite shock our ideas of legal propriety; and yet what was the testimony under consideration but proof that Fancy *Farrcr was an habitual poisoner? Had the testimony ■been given to rebut other testimony that tended to prove her ignorant of the nature of arsenic, the case would be quite different. But, as before said, no such testimony had been given. There had not been a tittle of evidence introduced tending to prove such ignorance, when the testimony objected to was admitted.
After much consideration, I think it was improperly admitted, and it is for this reason, and because of the misconduct of the jury, that I vote to reverse her sentence.
As to the defense of insanity, I think the law too well settled to be questioned. If a change is necessary, the legislative power must be invoked to make it.
First. There is no authority for holding that mere moral insanity, as it is sometimes called, exonerates from responsibility. Chief Justice Shaw’s charge, in Abner Rogers’ case, 2 Greenleaf’s Ev. 369-372, and Judge Birchard’s charge, in Clark’s case, 12 Ohio, 494; are quite as favorable to the defense of insanity as the authorities warrant. I will not say they are more so ; for, rightly,understood, they do not convey the idea that mere moral insanity constitutes Sk defense.
Secondly. As to the degree of proof. Nothing can be bettor settled than that insanity must be clearly proved. If the testimony only raises a reasonable doubt of sanity, the defense fails. But what is “ clear proof ?” According to Chief Justice Hornblower, in .Spencer’s case, -4 W. L. J. 115, it is proof that leaves no reasonable •doubt of insanity; in other words, insanity can be said to be clearly proved only when it is proved beyond a reasonable doubt-“When,” said the chief j ustice, “the question is, did the accused commit the homicide, the law presumes him innocent until its commission by him is shown beyond a reasonable doubt; but when the question is, was he sane when he committed it, the law presumes him sane until the contrary is in like manner established.” And, again : “ The proof of insanity at the time of committing the act •ought to be as clear and satisfactory, in order to acquit him *on the ground of insanity, as the proof of committing the .act ought to be, in order to find a sane man guilty.”
*67 This definition of the term. “ clearly proved,” has been questioned, and, it seems to me, justly. “ Clearly proved,” and “ proved beyond á reasonable doubt,” have not, I think, been generally considered as convertible terms. The latter, if I am not mistaken, has usually been held to imply a higher degree of certainty than the former. If the preponderance of testimony is clearly on the side of insanity, the fact ought, in my judgment, to be considered as clearly proved, although there is a reasonable doubt of its existence. No act is a crime unless perpetrated by an accountable being, and if we were to apply the same rule to the question of sanity that we do to all other facts necessary to constitute a crime, we would have to hold that a reasonable doubt of sanity is sufficient to acquit. But a different rule has always prevailed, and wisely. It is carrying the distinction far enough, however, and as far as public policy, upon which it is founded, requires, when we say that insanity must be established by a clear preponderance •of proof.
Ranney, T.
I think a new trial should have been granted, because of the misconduct of the jury ; and, for that reason alone, I vote to reverse the sentence.
Judgment reversed,, and cause remanded for new trial.